

FILED

DEC 0 2 2008

PATRICK E. DUFFY, CLERK
By _____
DEPUTY CLERK, MISSOULA

# UNITED STATES DISTRICT COURT

## BUTTE DIVISION, DISTRICT OF MONTANA

| | |
|---|---|
| In the Matter of the Search of | **APPLICATION AND AFFIDAVIT**<br>**FOR SEARCH WARRANT** |
| Yahoo! Account bdonat222@yahoo.com | CASE NUMBER: *mg-08-16-BU-JCL* |

I, Mark D. Seyler, being duly sworn depose and say:

I am a Special Agent of the Federal Bureau of Investigation, and have reason to believe that on on the premises known as, the computer systems owned, maintained, and/or operated by Yahoo!, headquartered at 701 First Avenue, Sunnyvale, California,:

in Northern District of California there is now concealed a certain property, namely

      See Attachment A,

which is evidence of the commission of criminal offenses, including Title 18 United States Code 922 (j), (Possession of Stolen Firearms); Title 18, United States Code, Section 871 (Threats against the President of the United States); and Title 18, United States Code, Section 879(E) (Threats against a Major Candidate for President).

The facts to support a finding of Probable Cause are as follows:

      See Affidavit which is attached and incorporated herein by reference.

Continued on the attached sheets and made a part hereof.  (x) Yes  ( ) No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence,

_12/2/2008_____    at     Missoula, Montana
Date

_Jeremiah C. Lynch_____
Jeremiah C. Lynch
United States Magistrate Judge

## ATTACHMENT A

## SEARCH PROCEDURE AND ITEMS TO BE SEIZED FROM YAHOO E-MAIL

### I. Search Procedure

a. The search warrant will be presented to Yahoo personnel who will be directed to isolate the account and files described in Section II below;

b. In order to minimize any disruption of computer service to innocent third parties, Yahoo employees and law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer account and files described in Section II below, including an exact duplicate of all information stored in the computer account and files described therein;

c. Yahoo employees will provide the exact duplicate in electronic form of the account and files described in Section II below and all information stored in those account and files to the agent who serves the search warrant;

d. Law enforcement personnel will thereafter review the information stored in the account and files received from the Yahoo employees and then identify and copy only the information contained in those account and files which is authorized to be further copied as described in Section III below; and

e. Law enforcement personnel will then seal the original duplicate of the account and files received from Yahoo employees and will not further review the original duplicate absent an order of the Court.

### II. Files and Account to be Copied by Yahoo Employees

a. All electronic mail stored and presently contained in, or on behalf of, the following electronic mail address and/or individual account: bdonat222@Yahoo.com.

b. All existing printouts from original storage of all of the electronic mail described above in Section II (a);

c. All transactional information of all activity of the electronic mail address and/or individual account described above in Section II(a), including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

d. All business records and subscriber information, in any form kept, pertaining to the electronic mail address and/or individual account described above in Section II(a), including applications, subscribers' full names, all screen names associated with the subscribers and/or account, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records; and

**Page Two**
**Attachment A**

e. All records indicating the services available to subscribers of the electronic mail address and/or individual account described above in Section II(a).

## III. Information to be Further Copied by Law Enforcement Personnel

a. Any electronic mail involving the following:

1. Information concerning the possession, sale, transfer, or storage of firearms or ammunition belonging to, or obtained from, Peter Koeck; including, but not limited to the firearms listed on the attached inventory, labeled "GUN INVENTORY, November 2005;

2. Information concerning the rental, maintenance, or release of any storage unit at any storage facility since 2004, including, but not limited to, American Mini Storage in Missoula, Montana, and Nelson Mini Storage in Whitehall, Montana;

3. Information concerning any threat to the President of the United States, as prohibited by Title 18, United States Code, Section 871, and/or any of the persons who are protected by the United States Secret Service as enumerated in Title18 United States Code, Section 879, including, but not limited to former major candidate, and current President Elect Barack Obama.

b. Any existing printouts from original storage involving the following:

1. Information concerning the possession, sale, transfer, or storage of firearms or ammunition belonging to Peter Koeck; including, but not limited to the firearms listed on the attached inventory, labeled "GUN INVENTORY, November 2005

2. Information concerning the rental, maintenance, or release of any storage unit at any storage facility, including, but not limited to, American Mini Storage in Missoula, Montana, and Nelson Mini Storage in Whitehall, Montana;

3. Information concerning any threat to the President of the United States as prohibited by Title 18, United States Code, Section 871, and/or any of the persons who are protected by the United States Secret Service as enumerated in Title18 United States Code, Section 879, including, but not limited to former major candidate, and current President Elect Barack Obama.

c. All of the records and information described above in Sections II(c), (d), and (e).

P08/103-034

# GUN INVENTORY

November, 2005

*Make    Model    Caliber        Serial Number*

**Pictures 1 & 2**

1. LAR Grizzly, .45 WIN MAG, A001855 ✓
2. Desert Eagle, .50 AE, 95253988 ✓
3. Thompson Contender, .223 REM, Model Super 14, 153519 ✓
4. Thompson Center Arms, .223 REM, Model Super 14, 333652 ✓
5. US REM Model 1903, 3200277 ✓
6. Mossberg .22 Training Rifle, 39946 ✓
7. US Model #1917 Winchester, 368079 ✓
8. Ruger 10/22, 23884904 ✓
9. Colt Official Police 33, .38, 527877 ✓
10. Colt Series 70, .45, 95455B70, incomplete ✓
11. .45 Argentine, 66877 ✓
12. .45 Colt Commander, 70BS11896 ✓
13. Colt Detective Special, .38, 33923 ✓
14. Colt .25 Auto, 0076309 ✓
15. .45 incomplete, 92721870 ✓
16. Luger, 9123 ✓
17. Colt Series 70, .45, C225996 ✓
VZ 24 Actions:  5754F, 3966, 6812P4, XR16227

**Pictures 3 & 4**

1. Colt M1991 A1, 2711551 ✓
2. Argentine .45, 63989 ✓
3. Colt DA .45, 296014 ✓
4. Desert Eagle, .50 AE, 81354 ✓
5. Colt Army Special, .38, 529074 ✓
6. Desert Eagle, .44, 59659 ✓
7. Colt Huntsman, .22, 314438S ✓
8. 762 NATO Upper, 007384 ✓
9. MP 5 K, 9mm, 21-13291 ✓
10. Ruger Mark I, .22, 96577 ✓
11. Sig P210-6, 9mm, P317341 ✓
12. Colt Series 80, Officers ACP, Wilson frame, .45, FAO2432E ✓
13. Grizzly, .45 WIN MAG, A001855 ✓
14. Colt Commander, .45, 70SC57629 ✓
15. Desert Eagle, .50 AE, 95253988 ✓
16. Colt Anaconda, .45, MM10549 ✓
17. Smith & Wesson Model 5905, 9mm, TFS2767 ✓
18. Colt incomplete .45, 1723265 ✓
19. Diamond Back Colt, .22, D80679 ✓

P081103-034

**Pictures 5 & 6**

1. Colt AR 15, SP116271
2. Mini 14, 18588973
3. AR 15, Sporter, ST033631
4. Winchester M-1 Carbine, .30, 9240655
5. .32 SCF 352731
6. AR 10, 006575
7. Dragenoff, 702258
8. Colt Revolver, Single Action, 1872, 20576
9. Colt Revolver, Single Action, 44/40, engraved, SA99223
10. Sig Arms, STG58 ? , 3458
11. Remington Model 700, .308, E6268915
12. Colt .45, 19272G70

**Pictures 7 & 8**

1. Maddi AK, AC0063325
2. Weatherby, 7mm, H121647
3. Browning A5 Light 12, 72G16775
4. .30 Remington, 8320
5. AR 7, A216365
6. Survival Rifle, M4, .22, 11481
7. Remington 700, 7mm Mauser, G6378914
8. Springfield M-1 Garand, 3725869
9. SSG 69, 81851 - Steyr Sniper rifle
10. Smith & Wesson, Double Action, .45, IACOSACCA

**Pictures 9 & 10**

1. Winchester Model 74/22, 338424
2. Remington Model 1917, 21647
3. VZ 24, XR13006 - Bruo Mauser
4. 300 Winchester Short Magnum, 4751
5. Colt action, .22, T13587
6. VZ 24, OR19496
7. Ultimate Accuracy, .50, M50849R
8. Colt New Frontier, .22, G20657
9. Argentine .45, 65176
10. Desert Eagle, .44, 67643-S
11. Colt Gold Cup, FNO5981E
12. Desert Eagle, 9mm, E04951
13. .45, RO3442
14. Rossi, .357, RG671582
15. Colt .45, 61772

P081103-034

**Pictures 11 & 12**

1. M 14 Carbine, 10377 ✓
2. M-1 Garand, 806137 ✓
3. Styer Aug, 908SA065 ✓
4. Mossberg Model 590, 12 Gauge, K676603 ✓
5. Colt AR 15 Sporter Lightweight, SL013483 ✓
6. Thunder Ranch Special, .870, W972511M ✓
7. AR 15 A-2, GC008277 ✓
8. AR Upper
9. Remington 700, .308, G62717067 ✓
10. AK 91, .308, A029430 ✓
    HK

**Picture 13**

1. .765 JP Sauer & Son, 1066 ✓
2. Walther D-1, 9mm, 354705 ✓
3. Argentine .45, 31016 ✓

~~**Picture 14**~~   No picture

1. LC Smith, 12 Gauge, FW48117 ✓
2. Heavy barreled, Winchester .338, No numbers ✓

15

Affidavit in Support of Search Warrant

## A. Introduction and Agent Background

1. I, Mark D. Seyler, have been employed as a Special Agent with the Federal Bureau of Investigation (FBI) for thirteen years. As a Special Agent, I have participated in the investigation of a variety of Federal crimes, including offenses relating to terrorism, firearms, and interstate transportation of stolen property. As the case Agent in several FBI investigations, I have applied for federal search warrants and participated in the execution of those warrants. I am familiar with the information contained herein through personal investigation, discussions with other law enforcement officers, and a review of documents relating to this matter.

2. This Affidavit is submitted in support of an application for a warrant to search certain accounts controlled by the free web-based electronic mail service provider known as Yahoo!, headquartered at 701 First Avenue, Sunnyvale, California. The account to be searched is bdonat222@yahoo.com which is further described in the following paragraphs and in Attachment A. This warrant is sought to obtain evidence of violations of Title 18 United States Code 922 (j), (Possession of Stolen Firearms); Title 18, United States Code, Section 871 (Threats against the President of the United States); and Title 18, United States Code, Section 879(E) (Threats against a Major Candidate for President). Because this Affidavit is being submitted for the limited purpose of requesting this warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe essential to establishing the necessary foundation for the requested warrant.

3. In my training and experience, I have learned that Yahoo is a company that provides free web based Internet electronic mail ("e-mail") access to the general public, and that stored electronic communications, including opened and unopened e-mail for Yahoo subscribers may be located on the computers of Yahoo. Further, I am aware that computers located at Yahoo contain information and other stored electronic communications belonging to unrelated third parties. Accordingly, this affidavit and application for search warrant seek authorization solely to search the computer accounts and/or files and following the procedures described herein.

## B. Search Procedure

4. In order to ensure that agents search only those computer accounts and/or files described in Attachment A, this affidavit and application for search warrant seek authorization to permit employees of Yahoo to assist agents in the execution of this warrant. To further ensure that agents executing this warrant search only those computer accounts and/or files described in Attachment A the following procedures will be implemented:

    a. The search warrant will be presented to Yahoo personnel who will be directed to isolate those accounts and files described in Attachment A;

    b. In order to minimize any disruption of computer service to innocent third parties, Yahoo employees and law enforcement personnel trained in the operation of computers

1

will create an exact duplicate of the computer accounts and files described in Attachment A, including an exact duplicate of all information stored in the computer accounts and files described in Attachment A;

   c. Yahoo employees will provide the exact duplicate in electronic form of the accounts and files described in Attachment A and all information stored in those accounts and files to the agent who serves this search warrant;

   d. Law enforcement personnel will thereafter review the information stored in the accounts and files received from Yahoo employees and then identify and copy the information contained in those accounts and files which are authorized to be further copied by this search warrant; and

   e. Law enforcement personnel will then seal the original duplicate of the accounts and files received from Yahoo employees and will not further review the original duplicate absent an order of the Court.

## C. Background Regarding Computers, the Internet, and E-Mail

  5. The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

  6. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience and knowledge, I know the following:

   a. The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities. In order to access the Internet, an individual computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet. The world wide web ("www") is a functionality of the Internet which allows users of the Internet to share information;

   b. With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods; and

   c. E-mail is a popular form of transmitting messages and/or files in an electronic environment between computer users. When an individual computer user sends e-mail, it is initiated at the user's computer, transmitted to the subscriber's mail server, then transmitted to its final destination. A server is a computer that is attached to a dedicated network and serves many users. An e-mail server may allow users to post and read messages and to communicate via electronic means.

## D. Yahoo

7. Based on my training and experience, I have learned the following about Yahoo:

a. Yahoo is an e-mail service which is available free of charge to Internet users. Subscribers obtain an account by registering on the Internet with Yahoo. Yahoo requests subscribers to provide basic information, such as name, gender, zip code and other personal/biographical information. However, Yahoo does not verify the information provided;

b. Yahoo maintains electronic records pertaining to the individuals and companies for which they maintain subscriber accounts. These records include account access information, e-mail transaction information, and account application information;

c. Subscribers to Yahoo may access their accounts on servers maintained and/or owned by Yahoo from any computer connected to the Internet located anywhere in the world;

d. Any e-mail that is sent to a Yahoo subscriber is stored in the subscriber's "mail box" on Yahoo's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds the storage limits preset by Yahoo. If the message is not deleted by the subscriber, the account is below the maximum limit, and the subscriber accesses the account periodically, that message can remain on Yahoo's servers indefinitely;

e. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Yahoo's servers, and then transmitted to its end destination. Yahoo users have the option of saving a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Yahoo server, the e-mail can remain on the system indefinitely. The sender can delete the stored e-mail message thereby eliminating it from the e-mail box maintained at Yahoo, but that message will remain in the recipient's e-mail box unless the recipient deletes it as well or unless the recipient's account is subject to account size limitations;

f. A Yahoo subscriber can store files, including e-mails and image files, on servers maintained and/or owned by Yahoo; and

g. E-mails and image files stored on a Yahoo server by a subscriber may not necessarily be located in the subscriber's home computer. The subscriber may store e-mails and/or other files on the Yahoo server for which there is insufficient storage space in the subscriber's computer and/or which he/she does not wish to maintain in the computer in his/her residence. A search of the files in the computer in the subscriber's residence will not necessarily uncover the files that the subscriber has stored on the Yahoo server.

## E. Stored Wire and Electronic Communication Access

3

8. Title 18, United States Code, Chapter 121, Sections 2701 through 2711, is entitled "Stored Wire and Electronic Communications and Transactional Records Access."

a. Title 18, United States Code, Section 2703(a) provides, in part:

A governmental entity may require the disclosure by a provider of electronic communication service of the contents of an electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of an electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

b. Title 18, United States Code, Section 2703(b) provides, in part:

(1) A governmental entity may require a provider of remote computing service to disclose the contents of any electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection –

(A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant...

(2) Paragraph (1) is applicable with respect to any electronic communication that is held or maintained on that service –

(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

(B) Solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

4

c. The government may also obtain records and other information pertaining to a subscriber to or customer of electronic communication service or remote computing service by way of a search warrant. 18 U.S.C. § 2703(c). No notice to the subscriber or customer is required. 18 U.S.C. § 2703(c)(2).

d. Title 18, United States Code, Section 2711, provides, in part:

As used in this chapter –

(1) the terms defined in section 2510 of this title have, respectively, the definitions given such terms in that section; and

(2) the term "remote computing service" means the provision to the public of computer storage or processing services by means of an electronic communications system.

e. Title 18, United States Code, Section 2510, provides, in part:

(8) "contents," when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication; . . .

(14) "electronic communications system" means any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications; . . .

(15) "electronic communication service" means any service which provides to users thereof the ability to send or receive wire or electronic communications; . . .

(17) "electronic storage" means --

(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and

(B) any storage of such communication

5

by an electronic communication service for
purposes of backup protection of such
communication

**F. Probable Cause Regarding Stolen Firearms**

9. On December 1, 2008, I conducted a telephone interview of Peter Koeck, an
Austrian citizen who lived in the United States until 2004. While living in the United States,
Koeck acquired a large personal collection of firearms. Most of these firearms were
purchased from licensed firearms dealers in the states of Nevada and Oregon. As described
more fully below, were transported by Koeck for storage and use in the state of Montana.
These firearms included handguns of various calibers, hunting rifles, and rifles designed
primarily for military use, including at least one .50 caliber sniper rifle. Koeck values this
collection at over $100,000. As noted below, Koeck's business partner, Donald Bernard, has
provided law enforcement with an inventory of Koeck's firearms collection, a copy of which
is attached to this affidavit.

10. Koeck advised that from 1998 to 2000, at least a portion of Koeck's firearms
collection was seized and held by the U.S. Bureau of Alcohol, Tobacco, and Firearms
(BATF). This collection was maintained by the government, while the Federal Immigration
and District Court system determined the validity of Koeck's visa status, and whether a
foreign person, such as Koeck could possess such a collection in the United States. This
litigation was resolved in Koeck's favor, and the government returned the firearms to him in
approximately 2001. I have reviewed pleadings, affidavits, and orders from the above
referenced Federal court cases, which confirm Koeck's assertion of ownership to these
firearms.

11. Koeck advised that in approximately 2004, he returned to Austria, and eventually
moved to Argentina where he owns and operates two hunting ranches. Because firearms
cannot be easily exported across international boundaries without approval from both the
country of export and country of import, Koeck left his firearms collection, and
approximately 150,000 rounds of ammunition of various calibers ranging from "22-250" to
.50 caliber, and other personal belongings, in the United States under the care of Frank
Heilig. Heilig was a personal friend of Koeck's, who lived near Whitehall, Montana, where
Koeck had been residing prior to his departure. Once his hunting ranch was established,
Koeck intended to obtain the proper approvals from the U.S. and Argentine governments to
ship the firearms collection to Argentina for use and display at his hunting ranch.

12. Koeck advised that in approximately 2005, he became concerned that Heilig had
stolen property from him, and gave permission for Robert Donat to take possession of his
firearms collection, ammunition, and other personal belongings. Donat, also residing near
Koeck's former Whitehall residence, was involved in a local land development venture with
Koeck, under the name S & C Corporation. Donald Bernard, who also lived in the area, was
the only other principal in S & C Corporation, the business of which was limited to creating
and selling a single subdivision near Whitehall, Montana. Koeck provided 100 percent of the

financing for this land development business.

13. On November 24, 2008, I interviewed Jesse Lemay, a long-time friend of Robert Donat, who currently resides in Three Forks, Montana. Lemay and Donat have spoken with one another on a weekly basis for several years, and maintain a current friendship. Lemay advised that he was present with Donat, shortly after Donat took possession Koeck's firearms collection in approximately 2005. Lemay helped Donat clean and store these firearms at Donat's home at 6 Upper Rader Creek in Whitehall.

14. Koby Bernard, the son of Don Bernard, has also been interviewed by law enforcement regarding this matter. Koby Bernard stated that in approximately November 2005, he was at Donat's house at 6 Upper Rader Creek Road, and helped Donat to inventory the firearms in Koeck's collection. A copy of this inventory, dated "November 2005", was turned over to his father, Donald Bernard, who I have personally interviewed. A copy of this 2005 inventory is attached.

15. In June 2006, Donat sold his 6 Upper Rader Creek residence, and moved with his family to a small metal building at 179 Sheep Camp Road near Whitehall. I have confirmed this information through a review of relevant property records, and through an interview of a real estate agent who sold Donat's Rader Creek home.

16. After selling his home on Rader Creek, Donat moved Koeck's firearms collection to American Mini Storage in Missoula, Montana. The firearms were stored in a locked unit leased under the name of Robert Donat's wife, Yvonne Donat. This information has been confirmed through law enforcement interviews of American Mini Storage personnel, and my personal review of a rental storage agreement dated June 29, 2006.

17. During recent interviews, Koeck and Donald Bernard advised that by approximately 2008, they began to suspect that Robert Donat had improperly enriched himself through the S & C land development business. Donat had also attempted to work for Koeck on Koeck's Argentine hunting ranch, but this arrangement had failed, and ended acrimoniously. As a result, beginning in late 2007, Koeck sought to regain any personal property that Donat was holding for him, including Koeck's firearms collection. Bernard and Koeck had been making progress in obtaining the proper paperwork to ship Koeck's firearms to Argentina. In several e-mails from Koeck to Donat, (to Donat's e-mail address bdonat222@yahoo.com), Koeck ordered Donat to surrender possession of Koeck's firearm collection and other personal belongings. Koeck told Donat that arrangements were being made to ship his firearms collection to Argentina.

18. Using his e-mail account, bdonat222@yahoo.com, from February through April 2008, Donat repeatedly agreed to give up possession of Koeck's firearms collection, ammunition, and other personal belongings. He agreed to place the ammunition in the Missoula storage unit, where the firearms were being stored, and transfer the keys and lease to the storage unit to Bernard. Despite repeated promises to do so, Donat delayed sending the keys and lease to Bernard for several months.

7

19. Donald Bernard has provided law enforcement with copies of e-mails between Donat, Koeck, Bernard, and others from this time period. These e-mails corroborate Koeck and Bernard's assertions that Donat agreed to transfer possession of Koeck's firearms collection and personal belongings to Bernard. Relevant statements from those e-mails, are as follows:

| February 25 | Koeck: | "send don [Bernard] the lease and keys for the storage unit." |
|---|---|---|
| February 25 | Donat: | "Pete, I will do this, Next week i am going to missoula i will put the rest of your items on my property in the storage facility. I will then transfer the lease to don and his home address. with this i will send him the keys. |
| March 16 | Koeck: | ". . . please mail the lease and keys to don." |
| March 16 | Donat: | "I am going to mail the key after i move the ammo." |
| March 25 | Koeck: | "Also bob, please mail the lease and keys. we want to go forward with the shipment" [shipping the firearms to Argentina] |
| March 26 | Donat: | "as soon as i get back to montana i will move the ammo and mail don the keys." |
| April 18 | Koeck: | "Bob, i really need you to get the keys and lease to Don now. we need to proceed with transportation. also since you told me the lease is paid til June i need to go forward asap. . . this is getting urgent." |
| April 18 | Donat: | " . . . I am going to missoula on wensday and will put your items in then and send the keys to Bernard. If you actually believe you can import those weapons to argentina you should look into it personaly because you will loose them if you try." |
| April 25 | Koeck: | Hi Bob, we're still waiting for the keys and the lease. you told me Wednesday, now we got Friday and we got nothing. what's up. i need the stuff ASAP in order to proceed. you can also just email the storage unit nr. and location in order to get things started. appreciate your compliance. pete. |
| April 25 | Donat: | you should tell don to look in his mail box i sent them. |

8

20. Finally, in approximately late April 2008, Donald Bernard received an envelope from Donat containing a copy of the lease agreement for Unit 00420 from American Mini Storage in Missoula, and two keys. On approximately April 30, 2008, Bernard traveled to American Mini Storage in Missoula, and confirmed that the keys opened the lock to unit 00420. Bernard confirmed that Koeck's gun collection and several boxes of ammunition were stored in the unit. Bernard did not conduct a complete inventory of the firearms at that time, but observed several plastic gun safes and/or containers which contained firearms which appeared consistent with those listed on the inventory prepared by Donat and Bernard's son in November 2005.

21. Bernard did not change locks on the unit on April 30, 2008, believing that Donat had sent him the only two keys which would open the lock. Bernard spoke with American Mini Storage personnel, and transferred the lease on unit 00420 from the name of Yvonne Donat, to "Don Bernard." As the lease on the unit was paid through July 2008, Bernard took over lease payments on the storage unit from that point forward. I have reviewed American Mini Storage documents signed and dated April 30, 2008, which confirm Bernard's actions on this date.

22. The civil dispute between Donat, Bernard, and Koeck, regarding Donat's management the S & C subdivision has continued. In October 2008, Bernard and Koeck's attorney requested that Donat provide an accounting for the S & C resources he managed. In Bernard's opinion, an accurate accounting may reveal that Donat has taken up to $300,000 from the S & C Corporation account for his own personal use.

23. On approximately 11/03/2008, Donald Bernard received a telephone call from American Mini Storage in Missoula. An employee advised that Robert Donat had been to the storage facility on 10/31/2008, and had demanded to enter the facility to obtain items from unit 00420. The employee indicated that Donat was told that he was no longer the lease holder on unit 00420, and could not enter the unit.

24. On 11/03/2008, Bernard traveled to Missoula and inspected unit 00420 at American Mini Storage. He found that Koeck's gun collection and ammunition were gone, and quickly reported them stolen to the Missoula Police Department. I have confirmed Bernard's reporting of this incident to the Missoula Police Department, and have reviewed that agency's reports concerning this matter.

25. American Mini Storage employees have advised that customers with storage units usually enter a pass code to enter the facility's outer perimeter. It is possible; however, for someone with a pass code to let an otherwise unauthorized person to enter with them. As such, even though Donat may not have possessed a valid pass code to enter the American Mini Storage property, he could have gained entry by following someone who did.

26. Jesse Lemay recalls speaking with Donat in approximately late October 2008 regarding Koeck's firearms collection. At the time, Donat told Lemay that he had traveled to Missoula and attempted to gain access to the storage unit where the guns were stored. He

9

then told Lemay that he had, "got them back," meaning he had taken Koeck's firearms collection. Lemay told Donat that taking the firearms was going to cause trouble, and cautioned Donat not to store the firearms at Donat's residence.

27. On November 14, 2008, the FBI served a Federal Grand Jury Subpoena, issued in the District of Montana, on Verizon Wireless, requesting subscriber information and toll records for telephones registered to Robert Donat. Records provided by Verizon Wireless, pursuant to that subpoena, indicate that Robert Donat pays for two cellular telephones, (406) 498-8248 and (406) 498-8250. Bernard and others have advised that Robert Donat has consistently used cellular telephone number (406) 498-8248 for the past two years.

28. The subpoenaed Verizon toll records show that on October 31, 2008 Robert Donat's telephone (406) 498-8248, made several calls, including calls to American Mini Storage in Missoula. The subpoenaed Verizon records also show the approximate location from which each of the calls from Robert Donat's telephone originated. These records indicate that, on October 31, 2008, Donat's telephone traveled from Whitehall to Missoula, and back to Whitehall. During that travel, Donat's telephone contacted a telephone number associated with Jesse Lemay. As noted above, Donat told Lemay that he had taken Koeck's firearms collection.

29. The subpoenaed Verizon records indicate that during the travel back to Whitehall, from Missoula, on October 31, 2008, Robert Donat's telephone repeatedly called (406) 498-8250, the other telephone registered to Robert Donat (and presumably used by his wife). This second telephone (likely Donat's wife) also made several calls on October 31, 2008, all appearing to originate from Whitehall, Montana. Following calls from Robert Donat's telephone in Missoula, his wife's telephone immediately made calls to two storage facilities in Whitehall, Montana, including the listed telephone number for Nelson Mini Storage.

30. On December 1, 2008, I interviewed the manager of Nelson Mini Storage, located at 1122 Montana Highway 55, approximately one-half mile south of Whitehall. The manager provided business records showing that on October 31, 2008, (the same date Robert Donat visited American Mini Storage in Missoula), Yvonne Donat rented storage unit number 20 at Nelson Mini Storage, under the name of her husband, Robert Donat. Yvonne Donat used a check to pay for six months storage, in advance, expiring April 30, 2009.

31. On December 1, 2008, I personally viewed the outside of storage unit number 20 at the Nelson Mini Storage. This location can be more particularly described as a storage unit, with a white door, bearing a black number "20", located near the northeast corner of a brown metal building with white trim, on the far north side of a fenced lot, located on the northwest corner of Montana Highway 55 and Capp Lane, approximately one-half mile south of Whitehall, Montana. A closed metal padlock was observed on the door of this storage unit.

32. During my recent interview with Peter Koeck, he advised that he did not give

10

Robert Donat permission to take Koeck's firearms collection from the Missoula storage facility. Koeck was confident that the lease for that facility had been transferred to Bernard, and that Bernard was the only person with access to the unit. Koeck specifically took these firearms away from Donat in early 2008 because he was fearful that Donat might attempt to take them for himself. Koeck has not communicated with Donat since July or August 2008. Koeck and Bernard have been actively planning to ship Koeck's firearms collection to Argentina.

33. On December 1, 2008, based upon limited information available to Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent J.J. Berger, Berger made a preliminary interstate nexus determination as to the alleged stolen firearms (from American Mini Storage in Missoula, MT).

34. As a recognized interstate nexus expert, it is Berger's opinion that the majority of ATF-licensed firearms manufacturers in the state of Montana are not large commercial-type operations; not typically manufacturers of commonly recognized firearms found in retail trade.

35. On December 1, 2008, Berger reviewed a list of the firearms reported stolen from American Mini Storage. Consequently, with the imperfect information available to Berger, he concluded that many of the firearms on the list appeared to have affected interstate and/or foreign commerce. Berger noticed that almost all of the aforementioned firearms were manufactured by well-known – in the firearms industry – firearms manufacturers who do not manufacture firearms in the state of Montana.

## F. Probable Cause Regarding Threats to the President and a major candidate for the office of President

36. On July 28, 2006, Timothy White, an inmate at the Lake Butler Correctional Institute in Florida provided unsolicited information to the United States Secret Service. In 2005, White was living and working in Whitehall, Montana, where he met an individual he knew as "Bob." White later identified a picture of Robert Donat from a photographic lineup as the person he knew as "Bob." In 2005, White observed Donat in possession of a large quantity of military-style firearms, ammunition, and what White believed to be grenades. At the time, Donat also told White that he was in possession of C-4 explosives. In 2005, Donat told White that he disliked President George W. Bush because President Bush had done too much for blacks. Donat indicated that he intended to kill President George W. Bush, because of the President's support for blacks. Based upon his conversations with Donat, and his observation of Donat's accumulation of firearms and ammunition, White believed that Donat presented, and continues to present, a valid threat to the President of the United States. Knowingly and willfully making a threat to take the life of the President of the United States is a violation of Title 18, United States Code, Section 871.

37. Donald Bernard has advised, that in approximately the early-spring or summer of 2007, Bernard and Donat discussed the presidential candidacy of Senator Barack Obama.

During these conversations, Donat referred to Obama as a "nigger," and stated that he would kill Obama before he became President. Bernard recalls Donat stating his intention to kill Obama at least two times, but Donat did not offer any specifics regarding how he might accomplish this act. Bernard did not perceive Donat's threat against Senator Obama to be serious enough to report to law enforcement, until it became clear in late October 2008, that Senator Obama would likely be elected President. Donat's contemporaneous theft of Koeck's military-style weapons, including high-powered sniper rifles, caused Bernard to bring these threats to the attention of law enforcement. As a major candidate for President in 2007, Senator Barack Obama would have been a person entitled to protection by the United States Secret Service. Threatening the life of a major candidate for the office of President is a violation of Title 18, United States Code, Section 879(E).

38. White and Bernard's allegations that Donat is an adamant racist, who makes violent threats, has been corroborated through several law enforcement interviews during the past month. For example, Jesse Lemay, one of Donat's closest associates, has advised that Donat consistently refers to blacks as "niggers", and speaks against blacks to such a degree and with such vitriol that Lemay has felt it necessary to leave the room. In a recent interview, Lemay warned the FBI and U.S. Secret Service that it would likely be dangerous to approach Donat at his Whitehall residence, as both Donat and his two sons, ages 10 and 12, are almost always armed. Lemay warned that Donat has repeatedly talked to his sons about being ready for the day when federal law enforcement comes to their home. In 2005, the Jefferson County Attorney, in Boulder, Montana, felt the need to issue a written warning to Donat not to threaten county officials. That letter referenced alleged threats by Donat regarding shooting, hitting, and "taking care of" various public officials.

39. On December 1, 2008, I interviewed a business person (hereinafter identified as CS-1) in southwestern Montana. CS-1 was involved in a business relationship with Robert Donat in 2004 and 2005. CS-1 confirmed that Donat is a virulent racist, who often speaks negatively and violently about blacks. CS-1 advised that once the business relationship with Donat soured in approximately 2005, Donat repeatedly made threats to shoot CS-1 in the head, even leaving threats to kill CS-1 on CS-1's telephone voicemail.

40. A search of Robert Donat's telephone number on the Internet reveals that he is a contact person for an Argentine Hunting Business, Argentine Outdoors Unlimited. In November 2008, an FBI employee, acting in an undercover capacity, obtained a business card directly from Robert Donat, in relation to Donat's hunting business. This business card listed Donat's telephone number, along with the e-mail address bdonat222@yahoo.com. As such, it appears probable that Robert Donat continues to use this e-mail account, the same account he used in April 2008 to communicate with Peter Koeck regarding Koeck's firearms collection.

41. In light of the above, there is probable cause to believe that Robert Donat has possessed and concealed stolen firearms, which had been previously transported in interstate commerce, in violation of Title 18 United States Code 922 (j); and has knowingly and willfully threatened to kill the President of the United States and a major candidate for the

office of President, in violation of Title 18, United States Code, Section 871 and Title 18, United States Code, Section 879(E); and evidence of those violations can be found in certain accounts (namely the account bdonat222@yahoo.com), controlled by the free web-based electronic mail service provider known as Yahoo!, headquartered at 701 First Avenue, Sunnyvale, California. I request that the Court issue a search warrant directed to Yahoo! allowing agents to seize the e-mail and other information stored on the Yahoo! servers for the identified computer accounts and files, following the search procedure described in Attachment A.

Mark D. Seyler, Special Agent
Federal Bureau of Investigation

Signed and sworn to before me this 2nd day of December, 2008, in Missoula, Montana.

Jeremiah C. Lynch
United States Magistrate Judge

13